FILED
2026 Apr-28 PM 04:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL IVY,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **LINCOLN NATIONAL LIFE INSURANCE COMPANY,** | ) | |
| | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

# COMPLAINT

Michael Ivy (Mr. Ivy or Plaintiff) with the assistance of his wife and agent pursuant to a Durable Power of Attorney, Holly Ivy, brings this action for violations of the Employee Retirement Income Security Act of 1974 (ERISA) committed by Lincoln National Life Insurance Co. (Lincoln) in connection with the provision of ERISA-governed disability benefits under a group insurance plan attached as **Exhibit 1** (the Plan). The Plan is sponsored by Plaintiff's former employer, Adtran, Inc. (the Employer). In support of the relief requested, Plaintiff alleges the following upon personal knowledge and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorney:

## JURISDICTION AND AUTHORITY FOR THIS ACTION

**1.** This is an action for legal and equitable relief seeking redress of violations of ERISA. This suit is brought pursuant to 29 U.S.C. § 1132(a) to secure disability benefits due to Plaintiff through the Plan. The Plaintiff seeks all benefits to which he may be entitled should this Court determine he remains "disabled," as defined long-term disability by the Plan and if applicable life-coverage-during-disability benefits under policies issued or administered and underwritten by Lincoln.

**2.** Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" as those terms are defined within 29 U.S.C. § 1001, et. seq.

**3.** Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the Plan was at least partly administered in this District and Defendant may be found or resides in this District.

## PARTIES

**4.** Mr. Ivy is a participant in the Plans at issue and thus entitled to benefits available thereunder. His wife Holly Ivy is his agent through a durable power of attorney so that she may assist in the claim given Mr. Ivy has cerebellar cognitive affective disorder. There are lesions on his brain suggestive of

Schmahmann's disorder. He has anterograde amnesia and has been diagnosed as having a form of vascular dementia. He has constant neck pain due to stenosis, fatigue and headaches.

**5.** Defendant Lincoln is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

**6.** Defendant Lincoln is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

**7.** One of Lincoln's designated agents for service of process is:

Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

**8.** Defendant Lincoln is an entity exercising all authority and control respecting the management or disposition of Plans' assets and the personnel exercising authority over Plan assets. This Defendant operates under a conflict of interest paying benefits out of its own assets.

**9.** Defendant Lincoln is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

**<u>THE PLAN</u>**

**10.** The Plan document, which is attached as **Exhibit 1** provides short-term disability benefits and long-term disability benefits at 60% of monthly earnings before disability.

**11.** The short-term disability benefit has been paid after an elimination timeframe of seven calendar days and then continued paying that benefit completely as the definition of disability was met throughout the twelve weeks of disability benefits provided as noted in **Exhibit 1**.

**12.** After ninety days of disability, the long-term disability benefit (LTD) then paid benefits at 60% of basic monthly earnings. See **Exhibit 1.**

**13.** For the first twenty-four months of LTD the definition of disability was met if the Plaintiff could not perform his own occupation. After twenty-four months the definition of disability required proof that the Plaintiff could not perform "any occupation" he was reasonably fitted to perform by reason of training, education, experience, age, and physical and mental capacity.

## LINCOLN'S LIABILITY

**14.** Lincoln's records show Mr. Ivy was hired by the Employer on May 12, 2003, and was covered under the Plan as of May 13, 2003. Mr. Ivy was a project engineer according to Lincoln, although the Employer described his occupation as Proservice Project Engineer II. His occupation required a high degree of cognitive function in order to assist with the installation, configuration, troubleshooting, and training of customers for the employer's network systems software.

**15.** Plaintiff's first occupation after graduating with a bachelor's degree from Mississippi State University was a project engineer position with the Employer. His occupation involved computer network services for large employers.

**16.** Mr. Ivy was the significant wage earner in his home. Until after January 2015, his wife did not work outside of the home given the couple had two daughters. The couple decided it was best for her to stay home in order to provide for their children.

**17.** Unfortunately, Mr. Ivy had a condition known as Ehlers Danlos syndrome. There is no cure for this condition. This syndrome is an inherited disorder that affects connective tissues and primarily skin, joints, and blood vessels according to respected medical sources including the Mayo Clinic.

**18.** Mr. Ivy also had neck problems and had a C6-C7 fusion surgery in September 2014. Unfortunately, in January 2015 he was hospitalized after suffering three distinct ischemic strokes — a left posterior inferior cerebellar artery (PICA) stroke, bilateral occipital strokes, and a left thalamic stroke — resulting from a left vertebral artery dissection caused by his underlying Ehlers-Danlos syndrome. Left vertebral artery dissection is a tear in the wall of the artery supplying blood to the back of the brain, often causing severe neck pain, headache, vertigo, and stroke symptoms. It is a leading cause of stroke in young to middle-

aged adults, often triggered by minor neck trauma, sudden movements, or underlying connective tissue issues. [1]

**19.** Mr. Ivy attempted a return to work but failed as he struggled with memory loss, cognitive sequencing difficulties and problems with abstract thinking. He experienced hallucinations, getting lost to and from work, severe confusion at work and home, flat affect, and lack of inhibition. Further he was at high risk for a recurrence of cerebrovascular accident, which could arise with minor trauma or neck movement. He was not able to work as of April 8, 2015, due to cognitive impairment following the strokes. He also had chronic migraines, neck pain, and bilateral hand osteoarthritis.

**20.** While the cognitive issues were most concerning, the physical issues also disabled him. The pain and headaches were distracting.

**21.** Lesions on his brain were found in January 2015 by MRI imaging at Vanderbilt. Mr. Ivy was diagnosed by the head of the stroke unit at Vanderbilt as having cerebellar cognitive affective disorder. Cerebellar cognitive affective syndrome (CCAS or Schmahmann's syndrome). According to peer reviewed medical literature, "This is characterized by deficits in executive function,

[1] See National Institutes of Health article : *Vertebral Artery Dissection*. By Tavakoli SG, Britt TB, Agarwal S. [Updated 2025 Apr 6]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2026 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK441827/.

linguistic processing, spatial cognition, and affect regulation."[2] This developed into encephalomalacia, a softening of the brain tissue which is a permanent incurable condition.

**22.** After these events and due to the loss of income, to prevent loss of the family home, Holly Ivy sought further education and certification as a schoolteacher and began teaching in the workforce.

**23.** The Plaintiff asserted a claim for short-term disability benefits and Lincoln found him disabled. This transitioned to long-term disability benefits and Defendant found the Plaintiff disabled. It paid these benefits beginning July 8, 2015. It specifically found that Mr. Ivy was disabled from performing his occupation.

**24.** Lincoln began to act inconsistently in 2016, going forward denying the claim and then reversing that decision at least two times.

**25.** The Plaintiff underwent extensive evaluations at Vanderbilt University's Medical Center, by Dr. Howard Kirshner. He found thalamus lesions on Mr. Ivy's brain which is the most common cause of anterograde amnesia. This resulted in a finding of Schmahmann's syndrome, a cerebellar cognitive affective

---

[2] Hoche F, Guell X, Vangel MG, Sherman JC, Schmahmann JD. *The cerebellar cognitive affective/Schmahmann syndrome scale*. Brain. 2018 Jan 1;141(1):248-270. doi: 10.1093/brain/awx317. PMID: 29206893; PMCID: PMC5837248. National Institutes of Health article.

disorder. He also found occipital lesions that affected perception and explained his hallucinations.

**26.** Dr. Kirshner is a graduate of Harvard Medical School and board certified in behavioral and vascular neurology. He treats patients in the Stroke Division and Cognitive Neurology Division for the Department of Neurology. He is the Professor of Neurology and vice chair for the Department of Neurology, Chief of the Stroke Division, and Director of the Vanderbilt Stroke Center. He is one of the most esteemed and premier experts in his field.

**27.** After twenty-four months and as of July 8, 2017, the definition of disability transitioned to the "any occupation" definition. Defendant denied the claim but that was reversed with an appeal. Eventually Defendant found the Plaintiff unable to work in "any occupation" as defined by the Plan.

**28.** This "any occupation" definition is not as stringent and difficult to meet as the Social Security Administration (SSA) definition of disability which is inability to perform any substantial gainful activity. The SSA found Mr. Ivy disabled on his initial application and paid a disability benefit. Only 20% to 25% of initial claims are paid by the SSA.

**29.** Defendant took advantage of this finding and reduced the long-term disability benefit by the amount of the initial SSA benefit. An overpayment on

past benefits developed and Mr. Ivy, with assistance from his wife, paid back part of the benefits received before that.

**30.** The Defendant's employees who were making decisions on this claim, however, received direction after receiving the overpayment money, that they should look for ways to terminate the claim. Despite the fact that Defendant is required to conduct consistent claim decision making and honor fiduciary duties, employees were aggressive and would disregard prior claim decisions and prior evidence in order to deny the claim.

**31.** Plaintiff hired Mr. Kenneth Hampton who obtained evidence documenting that Mr. Ivy remained disabled. Anne Herrington Darnell, a licensed professional counselor, certified rehabilitation counselor, and certified case manager performed an evaluation on Mr. Ivy inclusive of Wide Range Achievement Tests, Revision III (WRAT). This test was administered on October 23, 2024.

**32.** Mr. Ivy's test scores reflected his reading was at the post-high school grade level in the 55% percentile, but his spelling was at a high school grade level and less than the 27% percentile. Most notably his math skills tested out at the fifth-grade level. This was surprising given that Mr. Ivy's minor for his bachelor's degree was in mathematics. Ms. Darnell opined that the results underscored that

Mr. Ivy had "100% loss of access to jobs" and was not capable of "obtaining and maintain competitive employment".

**33.** Mr. Hampton submitted this report to Defendant by letter dated November 4, 2024. Defendant, however, disregarded this report and moved forward requiring Mr. Ivy to appear for a neuropsychological evaluation. A neuropsychologist typically would have concerns regarding the "practice effect" of administering similar tests so soon after the initial test. The WRAT test is often part of the test battery. The examination was set on December 27, 2024, barely over two months after the prior test administered by Ms. Darnell.

**34.** The neuropsychologist selected was Dr. Brian Thomas who is a regularly used neuropsychologist for long-term disability insurers. He has been the subject of documented unfairness in connection with his reviews. This is reported in recent litigation including Gilliland v. American United Life Insurance Co. case 6:24-cv-01684-ACA, Northern District of Alabama. Specifically, Dr. Thomas has repeatedly used a validity test to opine that the claimant is "non-credible" or that the test is "invalid" rather than explore the reasons for the invalidity. The insurer then assumes there is no proof of cognitive impairment, which is a false assumption, and then terminates the claim as it did here.

**35.** The field of neuropsychology recognizes that some individuals are so impaired they can't pass a validity test.[3] This had been demonstrated by Mr. Ivy in prior neuropsychology tests such as with Dr. Gifford in November 2015, and Dr. Lloyd in November 2016. What is required when that develops is for the neuropsychologist to look for the cause of the inconsistency. Neuropsychologists that did that found Mr. Ivy to be cognitively impaired despite invalid test results. Dr. Thomas ignored this duty in order to help out the insurer.

**36.** Mr. Ivy had to go to the examination without assistance from his attorney who unexpectedly died earlier in December 2024.

**37.** The report and testing of Ms. Darnell was not furnished to Dr. Thomas. He makes no reference to the report and makes no effort to distinguish the report. This was suspicious as an intentional act by Lincoln since that could invalidate some of the testing of Dr. Thomas due to "practice effect". It is contrary to neuropsychology protocols for similar tests to be conducted only two months apart. This was an unreasonable and unfair tactic by Defendant; however Plaintiff's impairment left him with no recall of taking the prior test.

---

[3] *Limitations of performance validity tests in dementia evaluations: The role of base rates.* Gaudet CE, Castelluccio B, Gold D, McLaughlin NCR, Correia S. Psychol Assess. 2022 Nov;34(11):1074-1080. doi: 10.1037/pas0001166. Epub 2022 Sep 22. PMID: 36136812; PMCID: PMC10080457. *Also see, Failed Performance on the Test of Memory Malingering and Misdiagnosis in Individuals with Early-Onset Dysexecutive Alzheimer's Disease*, Corriveau-Lecavalier N, Alden EC, Stricker NH, Machulda MM, Jones DT. Failed Performance on the Test of Memory Malingering and Misdiagnosis in Individuals with Early-Onset Dysexecutive Alzheimer's Disease. Arch Clin Neuropsychol. 2022 Aug 23;37(6):1199-1207. doi: 10.1093/arclin/acac016. PMID: 35435228; PMCID: PMC9396449.

**38.** Another unfairness was employed by Dr. Thomas. Anterograde amnesia requires a specific battery of neuropsychological tests. This specific battery was not employed by Dr. Thomas. Either he intentionally used different tests in an effort to obtain a result favorable for Lincoln, or he was completely unaware and thus unqualified to perform the exam for an individual with anterograde amnesia from Schmahmann's syndrome.

**39.** For example, the California Verbal Learning Test (CVLT) is typically utilized for a patient diagnosed with anterograde amnesia. Instead, Dr. Thomas used the Hopkins Verbal Learning Test – Revised (HVLTR). That test was developed to allow more impaired patients who might not be able to complete measures such as the CVLT. Their impairment is accepted and the test is given to measure decline. The fact that Dr. Thomas chose this measure suggests that he assumed that Mr. Ivy *would be too impaired* to be able to complete the CVLT.

**40.** There was an added unfairness by Dr. Thomas. He withheld his findings from the report which was not proper. His report failed to meet the basic requirements for a neuropsychological examination by reporting findings. This made producing the raw data a critical matter. The raw data request was ignored.

**41.** Since the report provided opinions relied on by Lincoln to deny the claim, providing the raw data was required. There is a duty by Defendant to preserve the claim record. This raw data is part of the claim record. Lincoln and

Dr. Thomas failed to provide that which is a breach of fiduciary duty for Lincoln. Plaintiff would provide a neuropsychologist to accept the raw data to protect test integrity, there was no reason for this failure.

**42.** There is consistent evidence of significant cognitive impairment across multiple evaluations. However, as he has done repeatedly for insurers Dr. Thomas used poor performance on validity measures to discredit the cognitive impairments of Mr. Ivy. That is biased, unreasonable and unethical.

**43.** When a patient fails a validity measure on neuropsychological testing, there are two possibilities - he is either feigning his deficits and intentionally doing poorly on cognitive testing, or his cognitive impairments are of such severity that they are impacting his ability to perform a validity test. If someone has severe attention issues and anterograde amnesia, they would be expected to have difficulty performing the validity measures which require attention and short-term memory to perform.

**44.** If Dr. Thomas reviewed the prior neuropsychological tests, he would know that Mr. Ivy was so impaired that he typically had difficulty performing validity measures. Dr. Thomas's report wrongfully implies Mr. Ivy must not have any impairment.

**45**. Dr. Thomas reveals his "game plan" by his test selection. He used the HVLTR test instead of the CVLT, which was due to perceived impairment. Dr.

Thomas then did not bother to report the data he obtained on his evaluation, nor did he attempt to integrate that data into an impression on why the patient had so much difficulty on the validity measures. As a result, this evaluation does not provide any useful information and falls well short of determining the nature and level of Mr. Ivy's well-documented impairment by treating doctors who have far more experience with this syndrome, illness, and symptoms than Dr. Thomas. The testing only reveals the extreme biased effort of Dr. Thomas.

**46**. Nonetheless, Dr. Thomas' report provided observations inconsistent with the opinions he sprinkled in his report. These observations favored Mr. Ivy's claim. For example, despite his bias, he found that Mr. Ivy "… did have some difficulty recalling relevant historical information such as the age of his two adult children and the names of his current treatment providers and medications …". "He also had observable difficulty with fine motor speed and coordination on the Grooved Pegboard test, having difficulty with both hands." That demonstrated a lack of bimanual dexterity critical in every occupation. Lincoln reviewers ignored this.

**47.** Dr. Thomas also concluded that the results of his cognitive testing could not be considered reliable or valid and thus he does not have information upon which to base an opinion on the "etiology of any cognitive problem *that may*

*or may not be ongoing*. His record does however document his history of strokes." (Italics added). He knew the truth but did not want to say it.

**48.** Defendant terminated benefits on February 14, 2025, despite the lack of evidence. Examining physicians documented ongoing restrictions and limitations and Ms. Darnell's report documented ongoing cognitive and vocational limitations. This evidence was ignored. Lincoln did not make an effort to perform a fair review. It did not demonstrate consistent decision making and did not demonstrate that Mr. Ivy could work full time in "any occupation". There was no proof that permanent brain damage no longer existed.

**49.** After the death of Mr. Hampton and after Lincoln's unfair termination of benefits, attorney John Pennington was assigned to take over many of Mr. Hampton's cases. An appeal was lodged on August 7, 2025.

**50.** Defendant, however, was determined to double down and purchased more medical opinions to support a claim termination. It rejected its own right to obtain an independent physical examination in favor of record reviews which were far cheaper. They would rely on Dr. Thomas' inconclusive report.

**51.** First, Dr. George Kum-Nji was hired to perform a "peer review" however he did not have any interaction with any treating physician, so it was difficult to see how this was a peer review. He simply ignored the opinions of

treating physicians as to permanent brain damage in favor of his own opinion based on selected medical records.

**52.** Dr. Kum-Nji is not qualified to render non-examining opinions regarding Ehlers Danlos syndrome. Usually, geneticists or rheumatologists are more apt to be qualified for treatment and understanding the illness, not a physical medicine physician. He was also not qualified to render an opinion on Schmahmann's syndrome. He has no expertise with this syndrome.

**53.** This physician found no restrictions with Mr. Ivy's hands, which is most ironic. He ignored the difficulties personally observed by Dr. Thomas regarding Mr. Ivy's use of his hands. Bilateral manual dexterity is generally considered important in performing an occupation. Dr. Kum-Nji's opinion was in conflict with Lincoln's own neuropsychologist.

**54.** Lincoln also hired a neurologist which it has frequently used in other cases, Dr. Sameer Jain. He hurt Lincoln's efforts. He noted in his report that a treating neurologist, Dr. Scott Hitchcock, found based on his clinical examination, that Mr. Ivy still had a great deal of fatigue, an ongoing history of migraines and cognitive problems. Dr. Jain found the opinions of Dr. Hitchcock credible and quoted them in fact. Mr. Ivy found to still have difficulty forming new memories. He found severe cognitive dysfunction ongoing since the stroke, and in particular severe anterograde amnesia.

**55.** Lincoln did not like his report which found that Mr. Ivy, when considering "… the entire clinical picture including evidence based medicine, and any medication or other treatment side effects, **the claimant does have a supported level of impairment that translates into restrictions and limitations from 02/14/2025 to present.**" (Emphasis added). He opined that Mr. Ivy had "no sustainable work capacity at any level permanently due to severe anterograde amnesia."

**56.** Lincoln very quickly sought a "clarification" of his report, despite the fact that this was a very clear opinion. Now Lincoln cajoled Dr. Jain to say that on limited records provided "from a physical neurology perspective only, there were no <u>physical</u> findings to support restrictions and limitations." That ignores ten years of evidence and exams. It ignores nerve impingement from cervical stenosis. However, Dr. Jain contended "…the claimant's neurological impairment is mainly related to anterograde amnesia which is mainly causing cognitive impairments …". Clearly his opinion still remained the same that anterograde amnesia was a disabling condition.

**57.** Dr. Jain also attempted to help some by contending that although chronic migraines were listed by him as an impairing diagnosis the condition did not cause any functional impairments. However, Dr. Jain had no basis to say this as he did not review any information on the number of migraines suffered each

month and their duration and intensity. That opinion would also require clinical examination. Headaches are not diagnosed without an exam. Limitations cannot be understood by reading medical notes alone.

**58.** Now having spent quite a bit of money buying opinions, Lincoln nonetheless tried to obtain a report from another neuropsychologist in hopes that it could support a claim termination, nonetheless. Lincoln had an obligation to consider all of its reviewing physicians and it would be unreasonable to rely on a neuropsychologist to disregard its own neurologist's opinion.

**59.** However, the neuropsychologist only reviewed medical records allegedly performing a "peer review" but without speaking to any of the prior neuropsychologist or physicians and relying exclusively upon the invalid report of Dr. Thomas.

**60.** At the very least Dr. Jenkins should have obtained the raw data from Dr. Thomas, but she did not do that. She had no findings to review since Dr. Thomas omitted those in his inconclusive report. She overlooked that the testing was not targeted on anterograde amnesia. She also overlooked that prior neuropsychological reviews had invalid test results which is a common issue with patients impaired by anterograde amnesia. Her report was not a legitimate review.

**61.** Dr. Jenkins report was also burdened with ridiculous typographical errors and a clear demonstration of her lack of qualifications to perform the review. She stated on 12/27/24 Brian Thomas PsyD said about Mr. Ivy "he was diagnosed with ADHD at **age 2020**" and then that "He also **escribed** his job…" (Emphasis added.)

**62.** More critically she **misstates** what Dr. Thomas stated. Dr. Jenkins states that <u>Dr. Thomas saw no evidence that pain or fatigue interfered with his participation or cognitive performance</u>. Anyone honestly reading Dr. Thomas report can see that Dr. Thomas noted in conflict with this statement that "he has a connective tissue disease that makes it **easy for him to dislocate his joints**; this **causes him constant pain in his hands, knee, neck**; has **problems with fine motor functioning**". Dr. Thomas also noted in his exam that Mr. Ivy "**frequently looked down due to pain**" and had o**bservable difficulty with fine motor speed and coordination on the Grooved Pegboard Test**. **He became frustrated when he did not know something he felt he should**; he **complained of a headache** in the afternoon phase of evaluation. (Emphasis added).

**63.** It is disingenuous for Dr. Jenkins to fail to note this conflict and instead latch on to a statement which was inconsistent with actual observations by Dr. Thomas. She discredits herself.

**64.** Dr. Jenkins also apparently does not know the difference between a

physiatrist and a psychiatrist. Dr. Jenkins reported that Dr. Newell was a psychiatrist. She said "**The psychiatric exam** revealed STM issues and normal mood and affect. He was alert and oriented x3 with fluent speech". Brent Newell, MD, is a board-certified Physiatrist with over 20 years of expert non-surgical care to Huntsville Hospital's Spine & Neuro Center. Dr. Newell performs Mr. Ivy's cervical blocks for ongoing neck pain involving stenosis at multiple levels. *Dr. Newell never performed a psychiatric evaluation.*

**65.** Dr. Jenkins also selectively reviewed records. She stated that on 5/12/25 Dr. Newell noted ongoing short-term memory issues, and that He was alert and oriented x3 with fluent speech and normal mood and affect. However, she left out that Mr. Ivy still had *intermittent headaches, intermittent arm pain/numbness/itching* – mostly at night and that he rated his pain 4/10 and also reported *fatigue, memory loss and high blood pressure at 169/109.*[4] She also conveniently excised from her report the fact that Dr. Newell found *on exam* tenderness to palpation paraspinal muscles; mildly reduced cervical range of motion due to discomfort. This was clearly a cervical neck exam.

**66.** Dr. Jenkins in documenting the 05/23/25 the examination by Dr. Hitchcock left out the complaints about *intractable migraine* and *cognitive*

[4] That is stage 2 hypertension which indicates severe hypertension requiring medical management.

*difficulties, hypersomnolence and a great deal of fatigue*. Dr. Jenkins was cherry picking records which further discredits her report.

**67.** Dr. Jenkins was asked by Lincoln to note comorbid diagnoses significant to impairment with ICD 10 Codes(s). Dr. Jenkins' response was "N/A" even though Mr. Ivy had additional diagnoses of extreme fatigue, chronic pain, Ehlers-Danios syndrome, SMAD4 gene mutation, encephalopathy, dementia, osteoarthritis, arthritic pain, cervical degenerative disc disease, cervical spondylosis/radiculopathy, obstructive sleep apnea, poor sleep, migraine, headaches, depression, daytime hypersomnolence, hyperlipidemia, left-sided weakness, left hip joint derangement, and plantar fasciitis. He also had pain, poor sleep, dementia, extreme fatigue, and depression would most certainly impact his cognitive issues. Many of these issues disabled Mr. Ivy from work.

**68.** Next Lincoln asked Dr. Jenkins "Taking into consideration the entire clinical picture, including evidence-based medicine and any medication or other treatment side effects, please describe how any supported level of impairment translates into restrictions and limitations from - 02/14/2025 to present, and comment on the expected duration". Dr. Jenkins responded "Despite reports of short-term memory issues, the most recent neuropsychological evaluation on 12/27/24 revealed the performance validity indicators were non-credible and test results could not be considered valid or reliable."

**69.** However, Dr. Jenkins demonstrates by these comments she is unqualified to evaluate such reports. In a rather well-known study found in the Journal of Neurology, Neurosurgery, and Psychiatry titled "Performance validity test failure in clinical populations—a systematic review" concludes the following: "Of note, validity test failure is particularly likely in moderate and severe traumatic brain injury, (i.e. a stroke) and both mild and moderate-to-severe dementia."

**70**. Finally, Dr. Jenkins was asked by Lincoln, "is the medical management recommended by the provider and/or followed by the claimant clinically reasonable and consistent with the apparent level of severity for the reported condition?" She replied that the medical management recommended by the provider and/or followed by the claimant is not clinically reasonable and consistent with the apparent level of severity for reported condition. There were no psychotherapy or psychiatric records within the time period or indication of cognitive therapy for his memory concerns.

**71.** This is specious and disingenuous. Mr. Ivy doesn't have memory concerns. This man has permanent brain injury/damage as documented by his 9/25/24 CT head and MRI brain showing left inferior cerebellar encephalomalacia. He requires constant supervision by his family overseeing his activities. He can only do some activities with constant supervision. This is not the same thing as being autonomous and having the ability to function in a work environment.

**72.** Generally, neuropsychologists must conduct an interview with the claimant and administer testing in order to provide a valid opinion. Ethically she could not provide an opinion without relying on the prior neuropsychological evaluations which found Mr. Ivy disabled. Ethically she was also duty-bound to consider the neurology opinion of Dr. Jain, Lincoln's neurologist. Even the report of Dr. Thomas could not provide an opinion one way or the other. Accordingly, Dr. Jenkins' opinion is invalid and based on her own conjecture.

**73.** Lincoln denied the appeal on this biased and invalid information of its record reviewers on January 7, 2026 and found the claim process exhausted.

**74.** Lincoln has conducted an unfair self-serving claim process. It had great difficulty lining up its experts to support its preordained attempt to terminate the claim. The raw data of Dr. Thomas' report has been withheld even though it is part of the claim record. The unfairness requires *de novo* review so the claim review can be fairly completed. This Court should provide a *de novo* decision due to this unfairness.

**75.** Further Lincoln has utterly failed to account for the risk of harm or death if Mr. Ivy attempted to work. Ehlers Danlos syndrome is a permanent condition already known to cause significant harm and impairment to Mr. Ivy when he attempted to work through the condition. Mr. Ivy is at risk of further harm and even death if he were to attempt to work. His blood vessels are at risk and

joints easily pop out of place. None of the physicians utilized by Lincoln have any experience with this syndrome. There is an ignored risk that simple awkward movement of the neck or a minor injury can result in a rupture of an artery to the brain.

**76.** The Plaintiff has exhausted all claim procedures and further exhaustion is a futile exercise.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Ivy respectfully requests this Court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a. For an order against Lincoln awarding Plaintiff all benefits due and owing with interest due thereon at 1.5% per month for each month the benefit is delinquent.

b. For a judgment against Lincoln and the Plan awarding Plaintiff all costs and reasonable attorney's fees incurred, connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1); and

c. For a declaration that the wrongful tactics and strategies employed by Lincoln violate the minimum standards of a full and fair review and Plaintiff further requests injunctive relief against Lincoln from utilizing

these tactics and strategies regarding future claim decisions on future benefits; and,

d. For a *de novo* review due to Lincoln's unfair claim tactics such as not providing a critical report to Dr. Thomas, failing to take into account "practice effect" on repeated testing, and refusing to provide the entire claim record inclusive of the raw data.

e. For such other relief as may be deemed equitable, just and proper.

Respectfully submitted,

/s/*David P. Martin*
David P. Martin ASB-3500-M68D
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
***david@erisacase.com***

**Plaintiff's Address**

Michael Ivy
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendant's Address:**

Lincoln National Life Insurance Co.
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104